# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

SAVANAH J. STEWART,

      Plaintiff,

      vs.

TRANS-ACC, INC., *et al.*,

      Defendants.

Case No. 1:09-cv-607

Judge Timothy S. Black

## ORDER THAT:
### (1)  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 48) IS GRANTED IN PART AND DENIED IN PART; (2) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 52) IS GRANTED IN PART AND DENIED IN PART; AND (3) PLAINTIFF'S MOTION TO STRIKE IS DENIED

This civil action is before the Court on Plaintiff's motion for partial summary judgment (Doc. 48), Defendant Trans-Acc, Inc.'s motion for summary judgment (Doc. 52), and the parties' responsive memoranda (Docs. 67, 70, 72, and 73); that is: Plaintiff Savanah J. Stewart moves for partial summary judgment as to the issue of Defendant Trans-ACC, Inc.'s liability on all of her causes of action, while Defendant moves for summary judgment dismissing Plaintiff's claims against it in their entirety.

The case arises out of a series of incidents Plaintiff endured while working at the Defendant company. Plaintiff maintains she was subjected to severe sexual harassment by her supervisor, Defendant Kwame Wilson,[1] and has sued for sexual harassment and

---

[1] Although Defendant Kwane Wilson initially responded to service and filed an answer in this case *pro se*, he abruptly ceased communication and has allegedly fled the country. Plaintiff's motion for partial summary judgment refers only to Defendant Trans-ACC.

retaliation under both state and federal law, and for intentional and/or negligent infliction

of emotional distress under state law.  In her motion, Plaintiff argues that there is no

genuine dispute of material fact that Defendant is liable to her on all counts.  Defendant,

conversely, submits there is no genuine dispute of material fact and it is entitled to

summary judgment as a matter of law on each cause of action.

## I. FACTUAL BACKGROUND[2]

In July 2008, Plaintiff submitted an employment application to Defendant,

interviewed, and was initially offered the job of sealer.  (*Id*. at 80-2).  On July 15, 2008,

Plaintiff met Wilson, who offered her a job as an office clerk, his subordinate, helping

him process job applications. (Doc. 51 at 103-08).  Roger McKeown, Defendant's

Operations Production Manager and Wilson's boss, had instructed Wilson to hire a

permanent office clerk because the temporary employee previously employed in that

position was too costly. (Doc. 55 at 24).  The office clerk position paid fifty cents more

per hour than the sealer job, and Plaintiff accepted it.  (Doc. 51 at 109).

During the July 15th meeting with Wilson, Plaintiff received a copy of

Defendant's Employment Manual, which included its sexual harassment policy.  (Doc. 51

at 84; Doc. 1 at Ex. A).  On Plaintiff's first day of employment, July 17, 2008, Defendant

required her to attend a comprehensive, eight-hour new employee orientation program

---

[2] *See* proposed undisputed facts submitted by both Defendant (Doc. 52 at Ex. 1) and Plaintiff (Doc. 70 at Ex. 2), and their respective responses admitting or denying each proposed fact.  (Doc. 70 at Ex. 1; Doc. 73 at Ex. 2).

presented by Tim Morrison, Defendant's environmental health and safety technician. (Doc. 51 at 84, 113; Doc. 54 at 6). It was an oral presentation with PowerPoint slides. (Doc. 52 at Ex. 3). Thirteen of the slides related to sexual harassment. (*Id.*). Orientation attendees also completed a quiz on the materials covered in the presentation, which included four questions on sexual harassment. (Doc. 51 at 93; Doc. 48 at Ex. V).

Plaintiff began her job as an office clerk the next day, July 18, 2008. (Doc. 51 at 152). On July 25th, Plaintiff approached Morrison, who was at the Hamilton facility to conduct an orientation. Plaintiff indicated that she had a problem and asked Morrison generally about the company's sexual harassment policy. (Doc. 52 at 16; Doc. 51 at 226-30; Doc. 53 at 92-3). Morrison told Plaintiff to report the harassment to a supervisor, but also gave Plaintiff his own cell phone number if she wanted to call him. (Doc. 51 at 226-27). Plaintiff did not describe specific instances of harassment to Morrison at that time, only questioning him about Defendant's sexual harassment policy in generalities. (Doc. 51 at 226-27; Doc. 54 at 94). Six days later, on July 31st, Plaintiff called Morrison on his cell phone and reported that Wilson had sexually harassed her, citing four specific instances all occurring at the Hamilton facility, the last one happening just prior to Plaintiff's call. (Doc. 51 at 249-50).

Plaintiff alleges that the first two incidents occurred on July 21 and July 24, 2008, in the conference/orientation room of Defendant's Hamilton office building. (Doc. 51 at 150-181, 201-209; Doc. 50 at 4-5). During the first, Plaintiff alleged Wilson

called her into the orientation room where he grabbed her breast so hard it bruised, exposed himself, and masturbated to ejaculation, getting his ejaculate on her pants. (Doc. 51 at 150-181, 189). Plaintiff maintains that next day, Wilson told her that if she did not like his advances, she could be demoted to the factory. (Doc. 51 at 193-200).

During the second incident, on July 24, 2008, Plaintiff alleges that Wilson again called her into the orientation room where he was masturbating, forced her hand to his erect penis, and eventually ejaculated. (Doc. 51 at 201-209). It was one day after this incident that Plaintiff asked Morrison about Defendant's sexual harassment policy.

On July 28, 2008, Plaintiff alleges she was sexually harassed by Wilson for a third time. Wilson lured her into the factory, backed her against a door, pulled out his erect penis, and thrust it against her while forcing his hand into her pants, attempting to pull them down. (Doc. 51 at 220-226).

Three days later, on July 31, 2008, Plaintiff alleges that Wilson forcefully blocked Plaintiff's exit from the women's restroom and then grabbed her head and neck, forcing it down towards his erect penis. (Doc. 51 at 234-245).

Plaintiff also alleges that throughout this ten day period, Wilson continued to make repeated inappropriate and sexually harassing comments, inviting Plaintiff to perform sexual acts and continually talking to her about sex and her personal life. (Doc. 51 at 153, 195). Plaintiff asserts that Wilson threatened her with demotion, indicating that if she did not comply with his advances and attacks, he would have her removed from her office position and demoted to the lower-paying position as a sealer in the plant's factory. (*Id.*

-4-

51 at 234-239).

It was after this fourth incident that Plaintiff phoned Morrison and reported Wilson's harassment. (Doc. 51 at 249-250). Morrison told Plaintiff that he was reporting her complaint to management immediately and that someone would be back in touch with her. (Doc. 54 at 101). Morrison took Plaintiff's call while standing outside of the Defendant's Blue Ash main office and relayed Plaintiff's complaint to company managers "within a minute" of the call. (*Id*. at 103). Morrison met with Tim McCarrick (his direct supervisor), Dave Damon (Defendant's General Manager), Joe Kauffmann (Defendant's Sales and Business Development Coordinator), and McKeown to discuss Plaintiff's allegations. (*Id*.) When Morrison left the meeting, he called Plaintiff to let her know that he had reported her complaint and that management would get in touch with her. (Doc. 54 at 103). Plaintiff was eventually placed on paid leave pending the outcome of the investigation.[3] (Doc. 56 at 60).

In mid-August, while the investigation was ongoing, Defendant learned that its business was slowing down, as one of a large customer's own business was decreasing. (Doc. 56 at 116-17). Defendant asserts that it eliminated the office clerk position held by Plaintiff as a result. (*Id*.) Since that time in August 2008, Defendant has reduced its workforce by approximately 80% - from approximately 300 employees to 60-65. (*Id*. at 19).

---

[3] *See* this Order at pp. 27-35, *supra*, for the facts as to the company's investigation.

The investigation ended inconclusively on September 8, 2008 with Defendant finding that it did not have sufficient evidence to corroborate either Wilson's story or Plaintiff's allegations. (Doc. 56 at 113). Thereafter, Defendant informed Plaintiff that her office clerk position had been eliminated. (Doc. 51 at 272). With no other office clerk positions available, Defendant offered Plaintiff a position as a sealer in any of its three plants, at the same rate of pay that she always received while working for Defendant - $8.50/hour. (*Id*. at 272). Plaintiff declined. Wilson was reinstated, working at the receiving dock at the Fairfield facility, with responsibility for inventory control, shipping, and receiving. (Doc. 56 at 119).

Plaintiff ultimately filed criminal charges against Wilson, and the City of Hamilton Police launched an investigation, during which it obtained DNA samples from the Hamilton facility. (Doc. 56 at 6-8). The City of Hamilton Police Department's tests indicated that samples obtained from the conference/orientation room at the Hamilton facility was semen that was a DNA match with Wilson. (*Id*.). Defendant learned of the police test results in August 2009 and immediately terminated Wilson's employment. (*Id*. at 11). The state subsequently indicted Wilson on three counts of Gross Sexual Imposition and a fourth count of Attempted Rape. (Doc. 48 at Ex. D).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter fo law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of showing, by identifying specific evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," that there exists no genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the movant meets its burden, it is then the opposing party's duty to "set forth specific facts showing there is a genuine [dispute] for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(a).

The requirement that the dispute be "genuine" is emphasized. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. Therefore, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id*. at 252. Furthermore, the non-moving party may not merely rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

"Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007); citing *Matsushita*, 475 U.S. at 587. A court's obligation at the summary judgment stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III. ANALYSIS

Both Plaintiff's and Defendant's competing motions seek summary judgment on Plaintiff's claims for: (1) sexual harassment, under both federal law, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and state law, Ohio Revised Code § 4112.02, *et seq.*, on either a *quid pro quo* harassment theory or a hostile work environment theory; (2) retaliation, as prohibited by the same federal and state sexual harassment laws; and (3) state common law intentional or negligent infliction of emotional distress. Each cause of action is addressed in turn.

### A.  Legal Standards for Sexual Harassment Claims

"[F]ederal case law interpreting [Title VII] is generally applicable to cases involving alleged violations of" the Ohio sexual harassment statute. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 175 (2000); *see also Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009). Therefore, both claims are analyzed collectively under the federal standards, as both parties did in their briefs.

Section 703(a)(1) of Title VII forbids "an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The terms "*quid pro quo*" and "hostile work environment" do not appear in the statutory text, yet the Supreme Court has sanctioned both such claims and federal regulations seek to define them. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 91 (1986); 20 CFR § 1604.11(a).  CFR § 1604.11 (a)(1) and (2) describe *quid pro quo* sexual harassment, while (a)(3) describes hostile work environment sexual harassment:

> (a) Harassment on the basis of sex is a violation of Section 703 of Title VII.  Unwelcome sexual advances, request for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

**B.    *Quid Pro Quo* Sexual Harassment**

To succeed on a *quid pro quo* sexual harassment claim, Plaintiff must prove: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) that either her submission to the unwelcome advances of a supervisor was an express or implied condition for receiving

job benefits or her refusal to submit to the supervisor's unwelcome demands resulted in a tangible employment action (also called an adverse employment action); and (5) liability may be imputed to the employer. *Sanford v. Main Street Baptist Church Manor, Inc.*, 327 Fed. Appx. 587, 596-97 (6th Cir. 2009); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000).

The Supreme Court defines a "tangible employment action" as, "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "While *de minimis* employment actions and 'very temporary' actions are not materially adverse and, thus, not actionable under Title VII, those involving changes such as a termination or a suspension constitute adverse employment actions." *Howington v. Quality Restaurant Concepts, LLC*, 298 Fed. Appx. 436, 442 (6th Cir. 2008). To satisfy this element, Plaintiff must prove a causal relationship exists between the tangible employment action and the sexual harassment. *Sanford*, 327 Fed. Appx. at 597. To prove causality, Plaintiff must show that she was subjected to a tangible employment action "*because of*" Wilson's sexual harassment. *Id*. at 599.

An employer is strictly liable when its sexually harassing supervisor takes a tangible employment action against his victimized subordinate. *Id*. at 760-63. The Supreme Court imposed blanket vicarious liability in this situation because of the supervisor's special relationship with both his employer and his subordinate. The

-10-

supervisor is in a unique position of power over his subordinate in a way a co-worker is not, in that the supervisor has the capacity to "inflict[] direct economic harm" on his charge. *Id.* at 762. Likewise, the supervisor is afforded this position of power by the employer, insuring that "the injury [from a tangible employment decision] could not have been inflicted absent the agency relation." *Id.* at 761-62. The tangible employment action is "the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Id.* at 762. "For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer," and so "it would be implausible to interpret agency principles to allow an employer to escape liability . . ." *Id.* at 762-63.

### 1.    Plaintiff's Motion for Summary Judgment

In Plaintiff's motion for summary judgment on her claim for *quid pro quo* sexual harassment she argues that Defendant is strictly liable for supervisor-Wilson's unwanted sexual harassment because it directly resulted in several tangible employment actions to her detriment. That she satisfies the first and third elements is not challenged. Defendant argues that there are genuine disputes of material fact as to the remaining elements.

### a.    Unwelcome Sexual Harassment

Plaintiff argues that the record overwhelming confirms she was subjected to unwelcome sexual harassment. (Doc. 72 at 7-9). In support, Plaintiff: raised the issue of sexual harassment generally to Morrison after the second of four alleged incidents;

reported Wilson's harassment to Morrison after the fourth incident; became so emotional about the events that Kauffmann recognized it and granted her (or required her to take) a paid leave of absence; and filed criminal charges against Wilson, for which the authorities indicted him and, seemingly, because of which he fled the country.

Defendant counters: Plaintiff's allegations are nothing more than Plaintiff's word against Wilson's; Wilson indicated that the encounters were consensual; Plaintiff did not report her allegations until there were four alleged incidents, which attenuates her claims that they were unwelcome; and there may be evidence that Plaintiff fabricated some testimony, which Defendant posits goes to the credibility of this claim (and, in fact, all of her claims). (Doc. 67 at 5-6).

However: Plaintiff told Morrison about the harassment twice, once generally or obliquely and once specifically. She took her allegations to the police, who interviewed her and believed her story enough to apply for a warrant to search the conference/ orientation room at Defendant's Hamilton office for any remains of Wilson's semen. (Doc. 48 at Ex. B (p. 499)). A neutral magistrate believed there was probable cause to grant the warrant and did so. (*Id*. (p. 500)). The police found Wilson's semen in the location provided by Plaintiff, further corroborating her allegations. (*Id*. at Ex. B (p. 501) and C (p. 344)). The police investigation led to Wilson's indictment on three counts of Gross Sexual Imposition and one count of Attempted Rape. (Doc. 48 at Ex. D (p. 346)). Defendant terminated him as a result of the police investigation. (*Id*. at 11). Wilson then

fled the country instead of facing the charges. This is not merely a "he said, she said" case with no corroborating evidence pointing either way.

Defendant also submits that Wilson asserted the conduct was consensual. Yet Defendant mischaracterizes the record. During the investigation, Wilson was interviewed four separate times by Defendant, and each time he denied that any sexual conduct occurred. (Doc. 72 at Ex. A). On August 25, 2008, after Plaintiff filed a report with the police but before Plaintiff's semen was discovered in the conference/orientation room, as Plaintiff alleged, Wilson gave a statement to the police again denying that any sexual conduct took place. (Doc. 48 at Ex. M). On April 16, 2009, after the police advised him that they found his semen, only then did Wilson, for the first time, indicate that he had a consensual relationship with Plaintiff. (*Id*). Interestingly, it appears Wilson never told Defendant that he and Plaintiff engaged in consensual sexual conduct. To reduce this history to the simple assertion that, "Mr. Wilson, when interviewed, indicated that the conduct was consensual," as Defendant does, is disingenuous. (Doc. 67 at 5).

To further buttress its argument that the alleged sexual harassment may not have been unwelcome, Defendant also argues that Plaintiff, "permitted the alleged conduct to occur four times without reporting it." (Doc. 67 at 5). Defendant again elides crucial facts providing context. After the second incident occurred, Plaintiff asked Morrison generally about the company's sexual harassment policy. (Doc. 51 at 226-27). This would tend to negate Defendant's favored inference that Plaintiff did not immediately

report Wilson's actions because they were not unwelcome. Finally, that a fellow employee, Krissy Webb, alleges that Plaintiff told her that she would wait for another incident before reporting the harassment does not indicate that it was somehow welcome, as Webb does not allege that Plaintiff said or intimated that it was consensual.

Ultimately, there is no genuine dispute of material fact that the sexual harassment was unwelcome to Plaintiff. Plaintiff has brought forth substantial evidence showing that Wilson's conduct was unwelcome and non-consensual. In response, Defendant has merely presented skewed accounts of the record, suggesting that Plaintiff was perhaps a willing participant. However, Defendant has not evidenced that a genuine dispute of fact exists on this issue.

<blockquote>

b. "Tangible Employment Action"
</blockquote>

Defendant makes a much more compelling argument regarding the fourth element. Plaintiff asserts that when she refused to submit to Wilson's sexual harassment and reported him to his superiors, she suffered several tangible employment actions: demotion, undesirable reassignment, and discharge. (Doc. 72 at 9). After Plaintiff reported Wilson's sexual harassment, she was "stripped of her office assistant position where she performed secretarial and clerical duties in the comfort of an air-conditioned office." (*Id.* at 10). Defendant thereafter "demoted her to the position of sealer, where she was forced to endure an undesirable reassignment on the production floor in the plant, doing manual labor in conditions where temperatures reached over 100 degrees." (*Id.*) To satisfy the causality requirement, Plaintiff maintains that Wilson's threats of demotion

to the plant were ultimately effectuated by Defendant. "All of these actions occurred shortly after [Plaintiff's] reporting of the sexual harassment, establishing the necessary causal relationship between the harassment and the employment action outlined in [*Sanford*]." (*Id.*)

Defendant argues chiefly that there is no causal nexus between Wilson's sexual harassment and his threats of demotion on the one hand, and a tangible employment action taken against Plaintiff on the other. (Doc. 67 at 7). Even assuming that a transfer to the plant with the same pay as she had as a clerk amounts to a tangible employment action (which Defendant does not concede), Defendant argues that:

> [t]he only reason that [Plaintiff] was not returned to the office clerk position is because the position was itself eliminated. And the position was not eliminated because of Mr. Wilson's alleged conduct. It was eliminated because the company correctly predicted that its workforce would be shrinking, and thus would not need to process job applications. Indeed, since the time that the office clerk position was eliminated, [Defendant's] workforce has shrunk by 80% - from around 300 to around 60. Instead, [Defendant] offered [Plaintiff] a position as a sealer in any of [Defendant's] three plants, at the same rate of pay that she always received at [Defendant company] - $8.50 per hour.

(*Id.* at 8).

Defendant maintains that Plaintiff's putative demotion was not causally related to Plaintiff's complaint about, or unwillingness to participate in, Wilson's sexual harassment. Instead, Defendant presents evidence that Plaintiff's transfer to the plant was precipitated by economic factors outside Defendant's control, and that Defendant

-15-

attempted to accommodate Plaintiff by giving her a position at her same salary, even though the position generally paid less.

To satisfy the causality prong of the fourth element, Plaintiff must prove that the loss of her clerk position occurred *because of* Wilson's harassment. *Sanford*, 327 Fed. Appx. at 598. In light of Defendant's evidence, and Plaintiff's lack of evidence evidencing a causal connection, Plaintiff's motion for summary judgment as to her claim for *quid pro quo* sexual harassment is denied.

### 2. Defendant's Motion for Summary Judgment

In Defendant's own motion for summary judgment, Defendant makes the same argument regarding Plaintiff's *quid pro quo* claim, most pertinently regarding causality. (Doc. 52 at 12). In defense, Plaintiff argues that Wilson's threats were in fact carried out by Defendant's executives and that the decision was made shortly after Plaintiff reported Wilson's harassment, both of which create the requisite causal link. (Doc. 70 at 5). Although Wilson had no input in, much less any authority over the decisions made by company executives, Plaintiff maintains:

> This does not show, as Defendant asserts, that Wilson had no role in the adverse employment action. Rather the adverse employment action by Defendant involved multiple players, all of whom were [Plaintiff's] superiors. The adverse employment actions, which took place shortly after [Plaintiff's] reporting of the sexual harassment, create the necessary causal relationship between the harassment and the employment action outlined in [*Sanford*]."

*Id.*

-16-

A thorough review of *Sanford* proves Plaintiff's argument mistaken. In *Sanford*, the plaintiff was a maintenance and security worker allegedly sexually harassed by his female boss, a property manager. 327 Fed. Appx. at 590-91. After reporting the harassment to his employer, the plaintiff alleged he suffered several tangible employment actions and sued for, *inter alia*, *quid pro quo* sexual harassment. *Id*. at 591. The plaintiff alleged one such tangible employment action occurred when his employer's board revoked his security duties, which represented a significant loss of pay. *Id*. at 598.

The Sixth Circuit agreed that this constituted a tangible employment action, yet found that the plaintiff could not prove that a causal relationship existed between it and the harassment he endured. *Id*. The board made the decision to strip him of his security duties, not the plaintiff's harasser, vitiating any causality. The plaintiff even argued that the decision-making board "'was tainted by [the harasser's] campaign of complaints about [the plaintiff's] work performance and so-called 'insubordination,'"" yet because there was no evidence that the harasser exerted anything like decisive influence on the board's decision, it did not create a causal relationship. *Id*. The court concluded:

> In light of the Sixth Circuit's finding in *Idusuyi v. State of Tennessee Department of Children's Services*, 30 Fed. Appx. 398, 401 (6th Cir. 2002), that a causal relationship between refusal of sexual advances and an adverse employment action was not established when the alleged former harasser had no formal role in making the materially adverse employment decision, [the plaintiff] fails to demonstrate the necessary causal relationship required by the fourth prong.

*Id*.

Plaintiff also argues that Defendant's putative reason for "demoting" her is not to be taken as gospel. Defendant admits that Wilson's boss, McKeown, asked him to hire a permanent office clerk, and Plaintiff sees some discrepancy between this admission and Defendant's allegation that the office clerk position was eliminated because the company believed its workforce would contract, thus alleviating the need for someone to process job applications. (Doc. 70 at 6; Doc. 52 at 13). In addition, Plaintiff finds it irrelevant that from the time of Plaintiff's employment in 2008 until now Defendant has reduced its staff by 80%, which Defendant repeatedly cites supporting its argument that the decision to eliminate Plaintiff's office clerk position was wholly unrelated to Wilson's sexual harassment of Plaintiff. Plaintiff argues that the time of consequence is that surrounding Plaintiff's "demotion," asserting that Defendant "attempts to conflate the relevant period into the larger period simply because the numbers during the relevant period do not work for its asserted defense." (Doc. 70 at 6). Plaintiff also points out that Defendant offered her the sealer position in multiple locations, one of which was the same place Wilson was reassigned, while another was the same place she suffered an attempted rape. (*Id*. at 6-7).

None of this changes the fundamental fact that Plaintiff has not evidenced (nor even alleged) that Wilson had any influence at all on, let alone any formal role in, Defendant's decision to assign Plaintiff to the position of sealer. Her attempts to link Wilson to Defendant's executives who actually made the decision are unsubstantiated and conclusory only and do not evidence causality. As in *Sanford*, while the decision to "demote" Plaintiff from office clerk to sealer may well constitute a tangible employment action, there is no evidence that the decision was made *because of* Wilson's harassment.

-18-

There is no material issue of fact in dispute precluding the conclusion as a matter of law that Plaintiff cannot make a *prima facie* case for *quid pro quo* sexual harassment. Accordingly, Defendant's motion for summary judgment on this claim is granted.

### C.  Hostile Work Environment Sexual Harassment

#### 1.  Elements

There is no genuine dispute that Plaintiff suffered unwanted sexual harassment by her supervisor.  Plaintiff has not shown, however, that such harassment ripened into a tangible employment action against her.  Under these circumstances, while Plaintiff's claim for *quid pro quo* sexual harassment fails, her hostile work environment sexual harassment claim remains.  As to this latter claim, because Plaintiff has proven that it was her supervisor who committed the harassment, the burden shifts, so to speak, to Defendant, who can only escape vicarious liability by establishing the so-called *Faragher-Ellerth* affirmative defense.

The *Faragher-Ellerth* affirmative defense holds that Defendant is:

> liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2nd Cir. 2004) (quoting *Ellerth*, 524 U.S. at 765) (other

citations omitted)).  The elements are conjunctive, thus Defendant must prove both to

absolve itself of liability.

> The affirmative defense encompasses active and inactive
> components: before the employer can benefit from the
> defense, it must prove both that it *acted* reasonably in
> preventing and correcting harassment and that the victimized
> employee unreasonably *failed to act* by not utilizing
> complaint opportunities.  The employer will lose this defense
> if it fails either prong.

*Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 349 (6th Cir. 2005).

The first prong of the *Faragher-Ellerth* affirmative defense underscores that

employers "have an *affirmative duty* to prevent sexual harassment by supervisors."

*Williams v. General Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999) (emphasis in the

original); cited by *Clark*, 400 F.3d at 349.  "Generally, an employer satisfies the first part

of this two-part standard when it has promulgated and enforced a sexual harassment

policy."  *Gallagher*, 567 F.3d at 275.

> While there is no exact formula for what constitutes a
> "reasonable" sexual harassment policy, an effective policy
> should at least: (1) require supervisors to report incidents of
> sexual harassment; (2) permit both informal and formal
> complaints of harassment to be made; (3) provide a
> mechanism for bypassing a harassing supervisor when making
> a complaint; and (4) [] provide for training regarding the
> policy.

*Clark*, 400 F.3d at 349-50 (citations omitted).

"While the affirmative duty on the part of the employer will often include the

requirement that it have some sort of sexual harassment policy in place, the duty does not

end there." *Clark*, 400 F.3d at 349. Courts must look "behind the face of a policy to determine whether the policy was effective in practice at reasonably preventing and correcting any harassing behavior." *Id*. In this regard, "[t]he effectiveness of an employer's sexual harassment policy depends upon the effectiveness of those who are designated to implement it." *Id*. at 350.

As to the second prong, the Sixth Circuit has held that "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Thornton v. Federal Express Corp.*, 530 F.3d 451, 457 (6th Cir. 2008). The sexual harassment laws are not self-executing. Employees have a responsibility under *Ellerth* to avail themselves of the preventive and corrective measures created by their employer for their benefit. *Ellerth*, 524 U.S. at 765.

## 2.     The First Prong of the *Faragher-Ellerth* Defense

The initial task in analyzing the first prong of the affirmative defense is to evaluate Defendant's sexual harassment policy on its face. Defendant did have a sexual harassment policy in the employee handbook, stating:

> Sexual harassment in the work place is strictly prohibited and rigorously enforced. A violation of federal and state laws, sexual harassment includes unwelcome sexual advances and verbal or physical conduct of a sexual nature when 1.) Submission to such conduct is used as a basis for an employment decision or 2.) Such conduct interferes with an individuals [sic] work performance or creates an offensive work environment. Serious disciplinary action, up to termination of employment, will be taken should a violation occur. (Doc. 1 at Ex. A).

Defendant conducted an orientation program for all new hires, including Plaintiff, that contained additional materials related to sexual harassment in the workplace. During the orientation program, Morrison lead a presentation which included thirteen slides regarding sexual harassment. The most pertinent slides stated:

> Any Trans-Acc, Inc. employee believing he/she has been the victim of sexual or other harassment should report the complaint/incident or alleged discrimination without fear of retaliation.
>
> - Trans-Acc, Inc. encourages all employees to report any sexual or other harassment situation as promptly as possible.
>
> - The report should be made to:
>
> ○ the employee's immediate Team Leader/Supervisor, or
> ○ Quality/EHS Manager if the complaint involved the employee's immediate Leader/Supervisor, or
> ○ any management individual with whom the employee feels comfortable.

(Doc. 52 at Ex. 3). Plaintiff points out that these slides were not distributed to her nor any of the attendees, and that the slides were but a small part of the eight hour orientation. (Doc. 54 at 17-8; Doc. 51 at 123-25). Defendant maintains that the slides used in the presentation explain in detail the type of conduct that Defendant prohibits, to whom the policy applies, Defendant's zero-tolerance standard, procedures, and the purposes of the policy. (Doc. 52 at Ex. 3).

Defendant has nominally promulgated a sexual harassment policy. But a single paragraph, it merely describes what sexual harassment is, deems it prohibited, and warns that it could result in termination. It fails, however, to satisfy any of the four baseline requirements that the Sixth Circuit has pronounced an effective policy "should at least" meet. *Clark*, 400 F.3d at 349. Crucially, it does not contain a reporting procedure, much less a mechanism for bypassing a harassing supervisor (as was the case in Plaintiff's situation).

Defendant argues that its sexual harassment policy is actually more comprehensive than that provided only in the employee handbook. The slides shown in the new employee presentation Plaintiff attended did address a reporting procedure and bypass mechanism, and Defendant argues that the slides themselves are training regarding Defendant's sexual harassment policy, which are basics of a model policy under *Clark*. Defendant notes that the orientation also included a multiple choice quiz, with four questions pertaining to sexual harassment. (Doc. 48 at Ex. V). Defendant submits that, including the slides, its anti-harassment policy meets the *Clark* guidelines.

Despite Defendant's effort to shoehorn them in, the slides seen during the presentation are not themselves part of Defendant's sexual harassment policy. The slides were never distributed to Plaintiff or other employees. (Doc. 52 at 15). To say that Defendant's policy includes presentation slides seen one time, in the middle of an eight hours-long orientation covering many topics, and not provided in paper form would

-23-

stretch the term far beyond its meaning.  In addition, Defendant's Employee Manual, in place at the time of Plaintiff's employment, plainly states: "This manual has been developed to provide all employees with a single source of information and reference about company policies."  (Doc. 1 at Ex. A, pg. 2).

Nevertheless, Defendant argues that its policy's shortcomings are not fatal, as the Supreme Court specifically refused to make the existence of a sexual harassment policy the *sine qua non* for the affirmative defense to liability.  The *Ellerth* Court wrote, "[w]hile proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense."  524 U.S. at 765.  Similarly, in *Clark*, the Sixth Circuit stated, "[w]hile the affirmative duty on the part of the employer *will often* include the requirement that it have some sort of sexual harassment policy in place, the duty does not end there."  400 F.3d at 349 (emphasis included).

Defendant is correct: a sexual harassment policy is not required by Supreme Court precedent, and the *Clark* guidelines are merely heuristic.  Yet the adequacy of Defendant's stated policy is manifestly important in determining whether Defendant satisfies this part of the *Faragher-Ellerth* defense, not only because presenting an adequate policy goes a long way toward satisfying this prong, but chiefly because it speaks to whether Defendant "exercised reasonable care to prevent . . . any sexually harassing behavior."  *Ellerth*, 524 U.S. at 765.  In this regard, Defendant's policy fails.

-24-

Defendant argues that an admission by Plaintiff in her briefing mitigates any mal-effects of its inadequate sexual harassment policy. That is, in defending her failure to report Wilson's sexual harassment immediately, Plaintiff states that "[i]t is not unreasonable for a victim of sexual assault who is afraid of her boss and in desperate need of maintaining her job to delay the reporting of such incidents." (Doc. 48 at 24). Defendant seizes on this statement, arguing, "[i]n light of this admission, even if [Defendant] had given [Plaintiff] a document explaining in great and precise detail to whom she should report harassment (and how), this may not have made any difference if she was not going to report the conduct anyway." (Doc. 67 at 13). Defendant concludes, "it was not the lack of an 'effective' policy that hindered any timely reporting, it was [Plaintiff's] conscious decision." (*Id.*)

But Plaintiff's statement does not absolve Defendant of its duty to use reasonable care to prevent sexual harassment in its workplace. Plaintiff testified that she did not know how to report sexual harassment, which is a direct result of Defendant's failure to create an adequate sexual harassment policy. (Doc. 51 at 116, 126-28).

While Plaintiff does not have an adequate sexual harassment policy, that is not the end of the analysis under the first prong. The Court must look behind the face of the policy to determine whether it was effective in practice with regard to Plaintiff's claims. A policy is not *per se* ineffective in practice simply because the resultant investigation failed to determine correctly whether sexual harassment occurred or not.

-25-

While the investigation started immediately after Plaintiff reported the harassment

to Morrison, and though it lasted for more than a month, Plaintiff contends it was

substandard and did not satisfy Defendant's duty to use "reasonable care to prevent and

correct promptly any sexually harassing behavior." *Ellerth*, 524 U.S. at 765.

Plaintiff alleges that, because of the company's inadequate sexual harassment

policy, Plaintiff did not know how or to whom to report Wilson's actions. (Doc. 51 at

116, 126-28). Following the second incident, Plaintiff approached Morrison and asked

about the anti-harassment policy. (*Id*. at 226-27). Morrison instructed her to tell a

supervisor, but also gave Plaintiff his own cell phone number. (*Id*.) Defendant maintains

that this shows that Plaintiff did in fact know how to report her claims of sexual

harassment. (Doc. 67 at 13). Yet Defendant's argument only confirms its

misunderstanding regarding its obligations under the sexual harassment laws.

As stated, the Sixth Circuit has explicitly held:

> It is no longer enough for an employer to take corrective
> action; employers now have an *affirmative duty* to prevent
> sexual harassment by supervisors. Once an employee has
> established actionable discrimination involving "no tangible
> employment action," an employer can escape liability only if
> it took reasonable care to *prevent and correct* any sexually
> harassing behavior.

*Williams*, 187 F.3d 561 (citation omitted) (emphasis in the original).

-26-

When Plaintiff asked Morrison how to report a sexual harassment claim, Morrison instructed her to tell her supervisor and gave her his own phone number. Thus, the undisputed record presents that when the Plaintiff asked how to report sexual harassment, Morrison, on behalf of Defendant, did not take any affirmative steps to see that sexual harassment was not occurring, and, instead, placed the burden on Plaintiff to report it. Defendant did not "exercise[] reasonable care to prevent . . . sexual harassing behavior." *Ellerth*, 524 U.S. at 765.

Moreover, once Defendant's investigation began, it was nothing more than a series of interviews of Wilson, Plaintiff, and other employees led by company executives with no experience or training in conducting sexual harassment investigations. The investigation was headed by Joe Kauffmann, Defendant's Sales and Business Development Coordinator, who admitted he had no training in investigating sexual harassment allegations, nor any background in human resources. (Doc. 56 at 13-4; 107-8). Roger McKeown, who participated in the investigation and was Defendant's Operations Production Manager, actually acknowledged in a meeting with Plaintiff that, "really this is out of my league. This is more human resource stuff than me." (Doc. 48 at Ex. G, p. 3). Diannier Stenson, Defendant's human resources manager had no certificate or associate's degree in human resources and had no training specifically devoted to sexual harassment. (*Id*. at Ex. A, p. 5-6). Plaintiff's case was the second time Stenson was involved in responding to a sexual harassment complaints in her six plus years at the

-27-

company, though she appears to have only been peripherally involved in Plaintiff's case. (*Id.* at 6-7). Shannon Petitjean was the Supervisor of the Hamilton Plant and was also involved in the investigation. (*Id.* at Ex. H, p. TA_0009). Dave Damon, the general manager, was involved as well. (*Id.* at TA_0010). There is no record evidence that Petitjean or Damon had training or expertise in sexual harassment investigations.

Because "[t]he effectiveness of an employer's sexual harassment policy depends upon the effectiveness of those who are designated to implement it," that the investigation into Plaintiff's claims was led by those with no training whatsoever in sexual harassment investigations does not support Defendant's contention that its policy was "effective in practice at reasonably preventing and correcting any harassing behavior." *Clark*, 400 F.3d at 349.

According to the time-line created by Defendant, the investigation began on July 31, 2008, following Plaintiff's call to Morrison reporting Wilson's sexual harassment. (Doc. 48 at Ex. H, p. TA_0008). A meeting was set up for the next day, August 1st, between Plaintiff, McKeown, and Stenson. Meanwhile, late in the day on July 31st, McKeown and Petitjean first met with Wilson to confront him regarding Plaintiff's claims, where Wilson denied Plaintiff's allegations in their entirety. (Doc. 72 at Ex. A, p. TA_0009, 0019). Wilson was told he was being placed on paid suspension during the investigation. (*Id.*)

The next morning, August 1st, McKeown and Stenson met with Plaintiff and Plaintiff's mother and stepfather. (Doc. 48 at Ex. H, p. TA_0009). An audio recording of

the meeting was made by Defendant, despite the fact that Plaintiff stated she did not want the meeting recorded unless she had a lawyer present, which she did not.  (*Id.* at Ex. G, p. 2).  An eighty page written transcript of that meeting was made from the recording and is part of the record.  (*Id.*)

On August 7th, Wilson was again interviewed by Damon, McKeown, and Kauffmann.  (Doc. 48 at Ex. H, p. TA_0010).  According to Defendant's notes of the meeting, Wilson "again stated that at no time did he ever have any physical contact with [Plaintiff].  He denied ever threatening or harassing [Plaintiff] at work."  (Doc. 72 at Ex. A, p. TA_0019).

On August 8th, Damon and Kauffmann interviewed Plaintiff and "several other associates in Hamilton."  (Doc. 48 at Ex. H, p. TA_0010).  On August 11th, Damon and Kauffmann attempted to meet with Plaintiff once again, but this time, according to Defendant's notes, Plaintiff "appeared upset" and "did not want to talk to [Damon and Kauffmann] or answer [their] follow up questions.  She became emotional and stated that everyone at Trans-Acc is treating her differently."  (*Id.*)

The next day, August 12th, Plaintiff did meet with Kauffmann and Damon.  While Plaintiff had no additional information to provide, she was placed on paid leave until the investigation ended.  (*Id.*).  Kauffmann testified that the decision to place Plaintiff on paid leave was made by Kauffmann, Damon, and Plaintiff, while Plaintiff testified she was forced to take the leave.  (Doc. 56 at 60; Doc. 51 at 257).  Kauffmann testified that

Plaintiff "appeared to Mr. Damon and myself still to be very emotional . . . and we just

asked her would she feel more comfortable if we, you know, provided her paid leave

while we were investigating the situation." (*Id.*)  Part of the reason Kauffmann offered

Plaintiff the option to take a paid leave was that she related that other employees "were

treating her differently, looking at her differently," as Kauffmann put it. (*Id.* at 61).

Kauffmann did not investigate Plaintiff's claims that employees were treating her poorly

following her allegations of sexual harassment.  McKeown did "re-emphasize to our team

leaders [and] associates that, you know, this investigation is ongoing and should not be

discussed," and told them not to harass or make any comments to Plaintiff. (*Id.* at 62,

65).  No formal investigation into possible retaliation for Plaintiff's allegations of sexual

harassment was ever initiated. (*Id.* at 63).

That same day, August 12th, Damon, Kauffmann, and McKeown had a meeting

over the phone with Wilson. (Doc. 72 at Ex. 1).  They asked if Wilson had any additional

information to add to his statements and he did not. (*Id.*)

On August 15th, Kauffmann again met with Wilson. (Doc. 48 at Ex. H, p.

TA_0010).  A transcript-like recounting of the meeting, prepared by Kauffman (*see* Doc.

56 at 71-2), appears in the record. (Doc. 72 at Ex. A, p. TA_0020).  Wilson repeatedly

stated, once more, that he never had any physical contact with Plaintiff. (*Id.* at TA_0020-

21).  Kauffmann asked Wilson about the dates specific to Plaintiff's allegations and

Wilson gave explanations for what he was doing, denying that the incidents Plaintiff

-30-

complained of occurred. (*Id*. at TA_0020-22).

On that date, August 15th, Defendant received a letter from Cook, Portune & Logothetis, LLC, apparently informing Defendant that they were counsel for Plaintiff. This is the final entry in the time-line. (Doc. 48 at Ex. H, p. TA_0010).

On August 19, 2008, Plaintiff brought her allegations to the City of Hamilton Police Department. (Doc. 1 at Ex. C). On August 21, 2008, Plaintiff spoke with Det. Mark Henson. (Doc. 48 at Ex. B (p. 499)). Plaintiff again reported her allegations, including that two of the incidents occurred in the conference/orientation room at Defendant's Hamilton office and resulted in Wilson ejaculating. (*Id*.) On August 22, 2008, Det. Henson filed an affidavit for a search warrant to check the conference/ orientation room for any evidence pertaining to Plaintiff's accusation. A judge of the Butler County Court of Common Pleas issued search warrant that same day. (*Id*. (p. 500)). On August 25, 2008, while Defendant's investigation was still ongoing, Det. Henson executed the search warrant, taking four swabs from the conference/orientation room of what appeared to be remnants of ejaculate. The warrant was returned on August 25, 2008, at 12:22 pm. (*Id*. (p. 501)).

Later that day, August 25th, at 1:47 pm, Wilson gave a voluntary statement to Det. Henson at the Hamilton Police Department's office. (Doc. 48 at Ex. M (p. 502)). Wilson was informed that Plaintiff accused him of touching her inappropriately. Wilson stated, "I wish to say that I have never touched her in any way sexually or with any kind of

-31-

sexual intentions." (*Id*. at (503)). He explained that during Plaintiff's interview he asked about her personal life because the previous employee in that position was constantly visited at the office by her boyfriend, and Wilson did not want Plaintiff to cause the same problem. (*Id*.) Wilson, apparently for the first time, related a story of Plaintiff acting flirtatiously towards him, for which Wilson said he scolded her, lest people "think there was something going on between us." (*Id*.) "From that point on," Wilson claimed, "[Plaintiff] continued to make remarks like I was going to fire her." (*Id*.) Wilson also alleged that approximately a week after Plaintiff's allegations surfaced, he was told by a fellow employee that the employee had overheard another co-worker "say that [Plaintiff] thinks I am going to fire her but that we will see who gets rid of who first." (*Id*.)

On September 8, 2008, Defendant completed its investigation, culminating in a document entitled, "Sexual Harassment Investigation Conclusion," which was sent to Plaintiff's attorneys the following day. (Doc. 73 at Ex. 1). The document was prepared by Kauffmann, with input from Defendant's counsel, and was signed by Kauffmann and Damon. (Doc. 56 at 113). Defendant's conclusion states:

> At this time the company has come to the conclusion and as a result of the investigation there are no facts on behalf of either party to substantiate or corroborate the statements of claims by [Plaintiff] or the response statements by Mr. Wilson. There are no witnesses for either party to verify the statements given by [Plaintiff] and Mr. Wilson.

(Doc. 73 at Ex. 1).

The document also states that during the pendency of the investigation Defendant's business demand had ebbed, forcing it to make "a business decision to eliminate the office clerk position at the H-2 facility and reduce the hours of applications taken at the H-2 facility and reassigning [sic] Mr. Wilson based on his work experience at Trans-Acc." (*Id.*) Because her position was eliminated, Defendant offered Plaintiff a job as a general labor associate at either the Hamilton, Blue Ash, or Fairfield facilities at the same rate of pay she received as an office clerk. "The company will make every attempt to return [Plaintiff] to the workplace in a position where there is no chance or likelihood where she might encounter Mr. Wilson during the course of her work day." (*Id.*)

Plaintiff rejected Defendant's offer, testifying that Defendant would not be able to assure her safety from Wilson. (Doc. 51 at 272-73). Defendant believes that Plaintiff refused the offer because the distance to the Blue Ash facility was too inconvenient, she was concerned about some employees at the Fairfield location, and she was not comfortable returning to the Hamilton facility where she was sexually assaulted. (Doc. 56 at 118).

On September 11, 2008, the Hamilton Police Department sent the swabs taken from the carpet in Defendant's conference/orientation room to the Ohio Attorney General's Bureau of Criminal Identification and Investigation for analysis. (Doc. 48 at Ex. C (p. 344)). Semen was identified on the swabs on March 9, 2009. (*Id.*).

-33-

On April 16, 2009, Wilson gave another voluntary statement to Det. Henson. (Doc. 48 at Ex. M (p. 506)). Det. Henson notified Wilson that semen was found in the conference/orientation room. "I do not know if it is mine but it could be," Wilson stated. (*Id.*) At this point, Wilson says that he and Plaintiff "established a friendship after the first week [of her employment]." (*Id.*) He related a story, again for the first time: Wilson was setting lunch for people in the conference room when Plaintiff came in and without saying anything began to kiss him, Plaintiff at all times the initiator and aggressor; the intimate moment ended with Plaintiff performing oral sex on Wilson. "I then told her to stop and she did," he stated. "I told her that I was sorry and I walked out. I do not think I ejaculated but I am not sure. This was the one and only incident that happened with her and I [sic]." (*Id.*) He alleged that Plaintiff and Wilson were mutually interested in each other and that Plaintiff's accusations were false. (*Id.*)

On August 27, 2009, Defendant terminated Wilson's employment. Defendant stated in a termination letter to Wilson that, ambiguously, it "obtained information which indicates that you participated in activity on the company premises that was in violation of company policies." (Doc. 48 at Ex. Q (p. 519)). Kauffmann testified that Wilson was terminated once the company received the police report, which indicated that Wilson's semen was found on company property, which is (perhaps ironically) a violation of company policy. (Doc. 56 at 11).

On or about June 3, 2009, Det. Henson took oral swabs from Wilson and

-34-

submitted them to the Bureau of Criminal Identification and Investigation for comparison. (Doc. 48 at Ex. C (p.344)). On July 10, 2009, the results revealed that the semen found in the conference/orientation room came from Wilson, or as the Bureau put it, "[d]ifferential extraction of the swab from the carpet resulted in a single DNA profile consistent with Kwame Wilson." The report continued, "[b]ased on the national database provided by the Federal Bureau of Investigation, the expected frequency of occurrence of the DNA profile from the sperm fraction from the swab from the carpet is 1 in 28,560,000,000,000,000,000 unrelated individuals." (*Id.*) (parentheticals omitted).

On August 18, 2009, Plaintiff filed the extant Complaint. (Doc. 1). On August 21, 2009, Wilson executed the summons and on September 15th he filed his answer, *pro se*. (Docs. 5, 8). On September 16, 2009, Wilson was indicted in the Butler County Court of Common Pleas on three counts of Gross Sexual Imposition and one count of Attempted Rape. (Doc. 48 at Ex. D (p. 346)). Wilson has not since been located and is rumored to have fled the country to his native Africa. (Doc. 56 at 27).

Defendant's investigation was not completely devoid of praiseworthiness. Defendant initiated the investigation immediately after Plaintiff lodged her allegations, which the Sixth Circuit has emphasized as good practice.

> The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified. By doing so, the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace.

*Collette v. Stein-Mart, Inc.*, 126 Fed. Appx. 678, 686 (6th Cir. 2005) (quoting *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001). Defendant also suspended Wilson, ensuring that Plaintiff would not be forced to work with her alleged harasser. Moreover, Defendant claims that if Plaintiff accepted its offer to return to work as a sealer, it would do all it could to ensure that Wilson and Plaintiff would not cross paths. Such measures, too, have been lauded as "how a responsible employer should act when confronted with an allegation of employment discrimination." *Id.*

However, Defendant's investigation - the offspring of its sexual harassment policy, which this Court is to examine to determine whether the policy "was effective in practice at reasonably preventing and correcting any harassing behavior," *Clark*, 400 F.3d at 349 - does not create a genuine dispute that Defendant failed to "exercise[] reasonable care to prevent and correct promptly any sexually harassing behavior." *Ellerth*, 524 U.S. at 765. Defendant's substandard policy begat a similarly facile investigation, consisting of nothing more than a series of interviews conducted by executives with no training in implementing sexual harassment policies or investigating sexual harassment claims. So long as no other witnesses saw the harassment occur, it was ineluctable that the investigation would find it an unresolvable case of "he said, she said" (as Defendant apparently still believes, to some extent).

The investigation's lack of substance is placed in greater relief by Defendant's apparent disregard for the police probe taking place concurrently. On August 25, 2008,

exactly two weeks before Defendant concluded its investigation, the Hamilton Police Department presented an affidavit for a search warrant, an impartial judge issued a warrant based on the affidavit, and the police executed the warrant, taking four swabs of what appeared to be (and turned out to be) remnants of semen in the place Plaintiff alleged she witnessed Wilson ejaculate. It is inconceivable that Defendant would conclude two weeks later that Defendant's investigation was inconclusive and that Wilson should return to work.

There is no genuine dispute that the investigation was neither reasonable nor effective. The investigation was equally as flawed as the sexual harassment policy upon which it was based. Defendant cannot show that it "exercised reasonable care to prevent and correct promptly" Wilson's sexual harassing behavior, and Plaintiff is entitled to judgment as a matter of law as to her claim for hostile work environment sexual harassment. Consequently, Defendant's conflicting motion for summary judgment on this claim is denied.

## 2. The Second Prong of the *Faragher-Ellerth* Defense

Though Defendant must satisfy both prongs of the *Faragher-Ellerth* affirmative defense, rendering its failure to prove the first element fatal, Plaintiff would still be entitled to summary judgment on her hostile work environment sexual harassment claim even if Defendant could satisfy the first prong, as Defendant cannot prove the second prong of the defense either.

-37-

Under the second prong, Defendant must prove "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765. The Supreme Court elaborated:

> while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807-8 (1998); *Ellerth*, 524 U.S. 765.

Plaintiff contends that Defendant cannot prove that she "unreasonably failed" either to avail herself of preventive or corrective opportunities provided by Defendant or to avoid harm otherwise. The events occurred almost immediately following her hiring. Plaintiff reported Wilson's behavior within ten days of the first incident, on the day of the fourth and last incident. (Doc. 70 at 15; Doc. 51 at 230, 249-50). She did so despite the fact that Defendant's sexual harassment policy did not contain either a general reporting policy or a method for bypassing her harassing supervisor.

After the second incident, Plaintiff did ask Morrison generally about how to report sexual harassment. As stated, Morrison told her to tell her supervisor. He also gave Plaintiff his own phone number and said she could call him if she had any problems. Plaintiff did not report Wilson's behavior until six days later, following two more

sexually harassing incidents. (Doc. 51 at 230, 249; Doc. 52 at 16). As a result,
Defendant asserts that Plaintiff "knew who she could contact to report a complaint, she
simply failed to do so." (Doc. 67 at 13-4; Doc. 52 at 16 (emphasis in the original)).

In support, Defendant quotes the Sixth Circuit in *Gallagher* for the proposition
that, "an employee's subjective fears of confrontation, unpleasantness or retaliation do
not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly
hostile environment." 567 F.3d at 276. Though Defendant does not mention it, the
*Gallagher* Court was actually quoting the Eight Circuit in *Williams v. Missouri Dept. of
Mental Health*, 407 F.3d 972, 977 (8th Cir. 2005), which in turn was quoting the Seventh
Circuit's decision in *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999).

In *Shaw*, the defendant employer had in place a sexual harassment policy,
distributed to each employee, that "provided for multiple mechanisms for the prompt
resolution of complaints. It is both specific and detailed, and it allows the complainant to
circumvent the supervisory chain of command." 180 F.3d at 811-12. Rather than avail
herself of the reporting mechanisms created by the company, the plaintiff never reported
the alleged harassment to her employer, even declining three requests for an exit
interview. Instead, she quit and filed a sexual harassment suit against the company. *Id.* at
810. In an effort to cast as reasonable her failure to inform her employer of the
harassment, the plaintiff argued "she didn't feel comfortable enough with anyone at [the
defendant company] to speak with them about the offensive and repulsive sexual conduct

displayed towards her by [her alleged harasser]." *Id.* at 813. The Seventh Circuit held

that "inevitable unpleasantness cannot excuse the employee from *using the company's*

*complaint mechanisms.*" *Id.* (emphasis added). Only then does the court write the

passage quoted by Defendant. In doing so, the Seventh Circuit brings us full circle, citing

and quoting *Ellerth*, quoted *supra*, for the proposition that, "(a demonstration of an

unreasonable failure to use any complaint procedure provided by the employer 'will

normally suffice to satisfy the employer's burden under the second element of the

defense')." *Id.* (quoting *Ellerth*, 524 U.S. at 765).[4]

A full genealogy of the bare quotation cited by Defendant reveals it is not a

defense at all, but rather support for Plaintiff's cause. Not only did the employer in *Shaw*

have a substantial anti-harassment policy with a legitimate reporting procedure, but the

plaintiff failed to report the harassment at all. In the case at bar, Defendant seeks to fault

Plaintiff for its own mistakes. An employee's duty under *Ellerth* is to use the reporting

procedures and mechanisms provided by the employer to apprise the company of any

harassment and present it with an opportunity to correct the behavior. Plaintiff may not

be blamed for failing to avail herself of a reporting procedure that Defendant did not

have.

---

[4] The circumstances of *Gallagher* do not support Defendant's position either. There, too, the
defendant employer had a facially valid sexual harassment policy containing a reporting system
with multiple avenues to bypass a harassing supervisor. 567 F.3d at 276. The plaintiff likewise
never reported the harassment, instead leaving the company for another job and instituting
litigation. *Id.*

Furthermore, when Plaintiff broached the issue of sexual harassment with

Morrison, a company executive, he abdicated his affirmative duty to prevent and correct

harassment. As Defendant stated, "On July 25th, the day after the second incident,

[Plaintiff] approached Mr. Morrison and indicated that she had a problem." (Doc. 52 at

16). Morrison did not investigate whether any harassment was occurring, did not seek a

meeting with Plaintiff to talk about her potential issues, but merely placed the onus back

on Plaintiff to be more specific. Even more, Plaintiff did specifically report the

harassment to Defendant, only ten days after the first incident. In no way did Plaintiff

"unreasonably fail[] to take advantage of any preventive or corrective opportunities

provided by" Defendant in reporting the harassment. *Ellerth*, 524 U.S. at 765.

Defendant also argues that Plaintiff was unreasonable in declining Defendant's

offer to return to work. (Doc. 52 at 17). Defendant's offer was in many ways generous:

despite a contracting workforce, Plaintiff was to be hired as a general labor associate, or

sealer; she could choose the facility, either in Hamilton, Blue Ash, or Fairfield; she may

have had her choice of shift; she would be paid at the same rate she was as an office

clerk, even though it was fifty cents more per hour than the normal beginning pay for a

sealer; and Defendant would, "make every attempt to return [Plaintiff] to the workplace in

a position where there is no chance or likelihood where she might encounter Mr. Wilson

during the course of her work day." (Doc. 73 at Ex. 1). "This was everything that Trans-

Acc could reasonably be expected to do. [Plaintiff's] refusal of Trans-Acc's

accommodations was entirely unreasonable," Defendant argues. (Doc. 52 at 17).

The question is not whether Defendant's offer was reasonable, but whether Plaintiff unreasonably failed to take advantage of this corrective opportunity provided by Defendant. Upon the record evidence, there is no genuine dispute that Plaintiff did not act unreasonably in declining Defendant's offer to return to work.

In her deposition, Plaintiff indicated that the distance to the Blue Ash facility in particular, and perhaps even the Fairfield facility, would be too inconvenient for her. (Doc. 51 at 271). Kauffmann testified that Plaintiff said that the Blue Ash facility was too far from her, that "she was concerned about some of the associates" at the Fairfield location, and that she did not feel comfortable returning to the Hamilton facility where the harassment occurred. (Doc. 56 at 118). Defendant submits that these were the reasons Plaintiff declined its offer. (Doc. 52 at Ex. 1, p. 7). Plaintiff denies this, alleging that when she was informed Wilson was returning to work, she did not feel safe working there. (Doc. 51 at 271-80).

In no way was Plaintiff's decision to decline Defendant's offer, generous as it may have been, unreasonable. Plaintiff would still be working for, as Defendant described itself, "a small, family-owned and operated company," that also employed her sexually harassing former boss whom she had just reported. (Doc. 52 at 16). Although Defendant's offer may have been reasonable, there was nothing unreasonable about Plaintiff's refusal under the circumstances.

-42-

Finally, neither did Plaintiff "unreasonably fail[] . . . to avoid harm otherwise."

*Ellerth*, 524 U.S. at 765.  Defendant does not even argue that Plaintiff did so.  As the

standard is worded, particularly the use of the word, "otherwise," this subpart of the

second prong refers to conduct undertaken by a plaintiff other than her failure to "take

advantage of any preventive or corrective opportunities provided by the employer."

*Ellerth*, 524 U.S. at 765.  Separate from failing to avail herself of Defendant's

preventative and corrective measures, Defendant does not allege that Plaintiff otherwise

failed to avoid harm.

In conclusion, Plaintiff evidences that she suffered sexual harassment by her

supervisor, Wilson.  Defendant evidences that such harassment did not engender a

tangible employment action against Plaintiff.  While Defendant is granted summary

judgment dismissing Plaintiff's claim for *quid pro quo* sexual harassment, Plaintiff's

hostile work environment sexual harassment claim endures.  Defendant bears the burden

of proving both elements of the *Faragher-Ellerth* affirmative defense to the hostile work

environment claim.  However, Defendant cannot evidence either prong of the defense,

much less both.  There is no genuine dispute that Defendant failed to "exercise[]

reasonable care to prevent and correct promptly any sexually harassing behavior," as it

neither had a sexual harassment policy approaching adequacy, nor used reasonable care in

investigating Plaintiff's claim.  Furthermore, there is no genuine dispute that evidences

that Plaintiff "unreasonably failed to take advantage of any preventive or corrective

-43-

opportunities provided by [Defendant] or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765. Therefore, Plaintiff's motion for summary judgment as to her hostile work environment sexual harassment claims, both under state and federal law, is granted; and Defendant's motion for summary judgment on the same claims is denied.

**D.    Retaliation**

Plaintiff's cause of action for retaliation, brought under both federal law, Title VII (42 U.S.C. § 2000e, *et seq.*), and Ohio law (O.R.C. § 4112.02 (I)), is governed by the interpretation of federal law. *Hampel*, 89 Ohio St.3d at 175. Federal law creates a burden shifting procedure: the plaintiff must prove a *prima facie* case for retaliation, then the defendant can rebut it by showing some legitimate, non-discriminatory reason, at which point the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for retaliation. *Sanford*, 327 Fed. Appx. at 598-99 (citing *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004)).

To present a *prima facie* case for retaliation, Plaintiff must prove: (1) she engaged in activity protected by Title VII; (2) Defendant had knowledge of her protected conduct; (3) Defendant thereafter took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Sanford*, 327 Fed. Appx. at 599 (citing *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002)). Importantly, Plaintiff's "burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *DiCarlo*, 358

F.3d at 420. If Defendant rebuts this showing, Plaintiff may show the rebuttal to be mere pretext by demonstrating that it: "(a) has no basis in fact; (2) did not actually motivate [Defendant's] challenge conduct; or (3) was insufficient to warrant the challenged conduct." *Sanford*, 327 Fed. Appx. at 599 (quoting *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003)).

Upon the record evidence, Defendant is entitled to summary judgment on this claim. Even assuming Plaintiff can make a *prima facie* case, Defendant has countered it by showing a legitimate, non-discriminatory reason for Plaintiff's "demotion" to the factory position of sealer: a large customer's business was decreasing, costing Defendant business, necessitating Defendant to reduce its workforce. In response, Plaintiff fails meet her burden to evidence pretext.

Plaintiff makes no effort in any of her memoranda to demonstrate that Defendant's reason is pretextual. In a different section arguing a different claim, Plaintiff appears to assert that Defendant's putative reason for "demoting" her was a facade. Plaintiff submits that the office clerk position for which she was hired, and from which she was offered a demotion, was permanent. (Doc. 70 at 6; Doc. 52 at 13). Apparently, Plaintiff believes this makes Defendant's decision to eliminate the position pretextual. But just because the position may have been permanent upon her hiring, does not mean Defendant could not eliminate it at a later date when business wanes. Defendant maintains that its business has decreased and, consequently, its workforce is substantially reduced. (Doc.

56 at 19). While Plaintiff argues that it is irrelevant that Defendant has since contracted its staff by 80%, asserting that the time of consequence is that surrounding Plaintiff's "demotion," Plaintiff does not offer any evidence contradicting Defendant's assertion.

Therefore, there is no genuine dispute that Defendant has evidenced a legitimate, non-discriminatory reason, rebutting Plaintiff's assumed *prima facie* case, and that Plaintiff in response has not proffered any evidence of pretext. Accordingly, Defendant's motion for summary judgment is granted on the retaliation claim, and Plaintiff's corresponding motion is denied.

**E.    Intentional and Negligent Infliction of Emotional Distress**

The Court has supplemental jurisdiction over Plaintiff's state law cause of action for both intentional infliction of emotional distress and negligent infliction of emotional distress. The Supreme Court of Ohio has described the tort of intentional infliction of emotional distress as, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 37 (1983) (citation omitted).

Liability exists:

> only where the conduct has been so outrageous in character,
> and so extreme in degree, as to go beyond all possible bounds
> of decency, and to be regarded as atrocious, and utterly
> intolerable in a civilized community.  Generally, the case is
> one which the recitation of the facts to an average member of
> the community would arouse his resentment against the actor,
> and lead him to exclaim, "Outrageous!"

*Id.* at 375.  "Serious" emotional distress involves an "emotional injury which is both

severe and debilitating.  Thus, serious emotional distress may be found where a

reasonable person, normally constituted, would be unable to cope adequately with the

mental distress engendered by the circumstances of the case." *Miller v. Currie*, 50 F.3d

373, 378 (6th Cir. 1995).

To the extent that Plaintiff seeks to hold Defendant liable for its own conduct -

namely, its investigation of Plaintiff's sexual harassment complaint and its offer of a

position as a sealer - there is no question that such conduct does not even approach the

severity or outrageousness required to prove either intentional or negligent infliction of

emotional distress.  Though the investigation was undoubtedly flawed, and while Plaintiff

may have been justifiably insulted at Defendant's job offer, such conduct is not nearly

heinous enough to sustain either tort.

To the extent that Plaintiff endeavors to hold Defendant vicariously liable for

Wilson's sexual harassment or assaults, she fails for different reasons.  In some

circumstances, Ohio law recognizes a cause of action against an employer for intentional

or negligent infliction of emotional distress resulting from sexual harassment in the workplace. As outlined in *Griswold v. Fresenius USA*, 964 F. Supp. 1166 (N.D. Ohio 1997), the Supreme Court of Ohio has carved an exception out of the general rule that, under Ohio law, a claim for emotional distress in the employment context does not register. In *Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486 (1991), the Supreme Court of Ohio acknowledged a claim by an employee for intentional or negligent infliction of emotional distress against an employer when the cause of action was based on a supervisor's repeated, severe sexual harassment, and when the supervisor had a history of sexually harassing behavior about which the employer knew or should have known. *Griswold*, 964 F. Supp. at 1172-73. Later cases construing *Kerans* have allowed such claims only when the harassment constitutes a felonious sexual assault under Ohio law. *Id.* at 1173.

In this case, Plaintiff has not submitted evidence that Wilson had a history of sexually harassing behavior of which Defendant knew or should have known. In her motion for partial summary judgment, Plaintiff exposes Wilson's many personal and legal problems in an attempt to cast Defendant as negligent in granting him supervisory authority, or perhaps complicit in Wilson's sexual harassment. Plaintiff details Wilson's immigration problems: that he allegedly forged his estranged wife's signature on his petition for permanent residency, that he lied to an Immigration Services interviewer, and that in June 2008 his permanent resident status was revoked. Plaintiff also traces

-48-

Wilson's domestic violence problems: that his wife obtained a domestic violence protection order against him only months before he sexually assaulted Plaintiff, and that in May 2008 he was charged with domestic violence for alleging punching and smacking his wife in the face, and had a temporary protective order entered against him.  (Doc. 48 at 10-11).  Plaintiff asserts that Wilson was still put in a supervisory position even after Defendant knew of his domestic violence charge.  (Doc. 48 at 11, citing Doc. 55 at 43). In addition, Plaintiff claimed in her deposition that there were rumors that Wilson had sexually harassed other employees.  (Doc. 51 at 246-47).  The alleged purveyor of these rumors denied spreading them (Doc. 66 at 36-7), and Defendant was never informed of any other sexual harassment allegations regarding Wilson.  (Doc. 55 at 57).

Accordingly, Plaintiff's claim does not fit the strictures of Ohio law for intentional or negligent infliction of emotional distress under *Kerans*.  There is no genuine dispute that Plaintiff has neither shown that Wilson had a history of sexually harassing behavior nor that Defendant knew or should have known of it.  Defendant is not vicariously liable in tort for the emotional distress caused Plaintiff by Wilson, and its motion for summary judgment as to that claim is granted.

## IV. PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

Plaintiff moved to strike Defendant's reply memorandum in support of its motion for summary judgment on the grounds that it was untimely.  There was some confusion regarding when the reply memorandum was due, owing to the different dates found in this

case's calendar order, this Court's Local Rules, and the Federal Rules of Civil Procedure. In any event, because Defendant's motion was submitted promptly and Plaintiff was not prejudiced by the late filing, and in light of this Court's preference for deciding issues on the merits, Plaintiff's motion to strike is denied.

## V.    CONCLUSION

Accordingly, for the reasons stated herein, Plaintiff's motion for partial summary judgment (Doc. 48) is **GRANTED IN PART** and **DENIED IN PART**, Defendant Trans-Acc, Inc.'s motion for summary judgment (Doc. 52) is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's motion to strike is **DENIED**.

Plaintiff is entitled to:

1.    Summary judgment against Defendant Trans-Acc, Inc. on the issue of liability for Plaintiff's claim for hostile work environment sexual harassment under both federal and state law.

Defendant Trans-Acc, Inc. is entitled to:

1.    Summary judgment on Plaintiff's claim for tangible employment action sexual harassment under both federal and state law;

2.    Summary judgment on Plaintiff's claim for retaliation under both federal and state law;

3.    Summary judgment on Plaintiff's claim for intentional or negligent infliction of emotional distress under state law.

**IT IS SO ORDERED.**

Date:  4/25/11

_Timothy S. Black_
Timothy S. Black
United States District Judge